**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-85 (BAH)** |
| **v.** | : | |
| | : | |
| **RONALD ANDRULONIS,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Ronald Andrulonis to two months of incarceration, 12 months of supervised release, and a $25 special assessment. The government also requests, consistent with the plea agreement in this case, $500 in restitution.

## I.    Introduction

Defendant Ronald Andrulonis, a 38-year-old former Amtrack employee, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Andrulonis pleaded guilty to violating 18 U.S.C. § 1752(a)(1). The government's recommendation is supported by Andrulonis' actions on January 6, 2021, including Andrulonis': (1) decision to enter the Capitol not once, but twice; (2) casual observations of rioters inflicting violence against police; (3) entry into a Senator's private office; and (4) lack of sincere remorse for his actions. The recommendation also considers the information Andrulonis provided to the government that will assist in another January 6th investigation.

The Court must also consider that Andrulonis' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Andrulonis' crime support a sentence of two months' incarceration and 12 months of supervised release.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1 and 20.

### *Defendant Andrulonis' Role in the January 6, 2021 Attack on the Capitol*

In the early morning hours of January 6, 2021, Andrulonis boarded an Amtrak train from Philadelphia to Washington, D.C. to attend former President Trump's "Stop the Steal" rally. See *Exhibit 1.* Andrulonis was an Amtrak employee at the time and used his Amtrak employee badge to board an Amtrak train without paying. Andrulonis traveled with a friend, later identified as

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Robert Ciottoni. Andrulonis attended the rally at the Ellipse before making his way to the Capitol

building. Andrulonis could be seen during the day in red a "Make America Great Again" hat.



*Image 1: Open source still (no longer available) of Andrulonis (yellow) at the "Stop the Steal" rally.*

Andrulonis spent time in a crowd that eventually breached the Northwest Steps, gaining access to

the Upper West Terrace where several rioters used police barriers as ladders to scale the steps.



*Image 2: Still of Andrulonis at the foot of the Capitol's Northwest Stairs.[2]*

---

[2] Available at https://archive.org/details/9T4Pk6mur7TZ8Xk2K (time stamp :08).

### *Andrulonis' First Breach of the Capitol*

At approximately 2:24 p.m., Andrulonis entered the first floor of the Capitol through a smashed window adjacent to the Senate Wing doors. See *Exhibit 5*.  This was approximately 11 minutes after the initial breach of those doors.



*Image 3: CCTV still from Exhibit 5*

Once inside, Andrulonis made his way to the second floor and into the Rotunda, where he took photographs as his companion (red) knocked over velvet barriers that lined a walking path in the Rotunda. See *Exhibit 6* and *Exhibit 15*.



*Image 4: CCTV still (Exhibit 15) Andrulonis photographing the Rotunda as his companion knocks over the barriers.*

Andrulonis then traveled back to the first floor, entering the Crypt, where he witnessed rioters jeering and throwing chairs at USCP officers as they attempted to secure a vertical closing door in the Crypt Lobby. See *Exhibit 7*.



*Image 5: Still from Exhibit 7 at time stamp 1:17.*

At an unknown point during his time in the Capitol, Andrulonis entered Senator Merkley's office and sat on a couch. There he was captured in the back of a selfie taken by a fellow rioter[3]. Senator Merkley's office is located on the first floor, near the Senate Wing Door and Crypt.



*Image 8: Andrulonis, while in Senator Merkley's office, captured in the background of a fellow rioter's selfie.*

---

[3] The rioter, Joshua Haynes, pleaded guilty to a violation of 18 U.S.C. § 1512 (21-cr-594).

Andrulonis exited the Capitol at approximately 2:35 p.m. via the Memorial Doors. See *Exhibit 13* at :25-30. About three minutes later, Andrulonis walked back to the door where he posed for a selfie as police attempted to clear rioters from the building. *Id*. at 3:46.



*Image 9: Andrulonis' selfie from the Memorial Doors.*

***Andrulonis' Second Breach***

After taking the photo, Andrulonis walked to the east front steps which led to the Columbus Doors. A large crowd had formed outside these doors resulting in a violent breach of the doors starting at 2:25 p.m. Andrulonis entered with a stream of rioters at approximately 2:43 p.m. See *Exhibit 10*.



*Image 10: Still from CCTV capturing Andrulonis second breach into the Capitol.*

Andrulonis spent more time in the Rotunda before joining a crowd gathering in the Old Senate Chamber, which is adjacent to the Rotunda, at 2:45 p.m.



*Image 11: Still from CCTV which captured other rioters waving people down a hallway and Andrulonis following.*

While in the Old Senate Chamber hallway, Andrulonis heard other rioters chanting: "Whose house? Our House!"; "Our country!"; and "Fuck McConnell!" while they confronted a line of MPD police officers. See *Exhibit 12*.  Andrulonis was emersed in the crowd as others began to push against the MPD officers. *Id*.  Andrulonis immediately left the area when rioters began to push against the police line and the officers began to use pepper spray.  See *Exhibit 14* at :03. Andrulonis retreated to the first floor and then exited the Capitol at an unknown time.



*Image 12: Still from Exhibit 12 showing Andrulonis near the front of a crowd that stretched behind him, down the hallway, and back towards the Old and New Rotundas.*

*Social Media Posts*

After January 6, 2021, Andrulonis posted the selfie outside the Capitol (Image 9) to social media. That post was forwarded to the FBI numerous times in the form of tips.

*Defendant's Post Plea Interview*

On November 16, 2021, Andrulonis met with the assigned agent for a post plea interview. During the interview, Andrulonis provided crucial identification information that will move forward a different January 6th investigation.

*The Charges and Plea Agreement*

On February 28, 2023, the United States charged Andrulonis by a four count Information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On September 8, 2023, pursuant to a plea agreement, Andrulonis pleaded guilty to Count 1 of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(1). By plea agreement, Andrulonis agreed to pay $500 in restitution to the Architect of the Capitol. *See* ECF No. 19.

## III.    Statutory Penalties

Andrulonis now faces a sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.     The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)(vii) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 30-38.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.  Section 4C1.1 will be in effect at the time of sentencing in this matter but was not considered at the time the parties entered into the plea agreement.

The Court should not apply § 4C1.1 here for the reason that the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally

threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[4]

*Guidelines*

The U.S. Probation Office calculated Andrulonis' criminal history as a I. PSR at ¶ 41. Accordingly, the U.S. Probation Office calculated Andrulonis' total adjusted offense level, after acceptance, at 4 and his corresponding Guidelines imprisonment range at 0-6 months. Andrulonis' plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the

---

[4] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

Section 3553(a) factors weigh in favor of two months' incarceration, 12 months' supervised release, and a $500 dollar fine.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Andrulonis' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Andrulonis, the absence of violent or destructive acts is not a mitigating factor. Had Andrulonis engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Andrulonis' case were his two separate breaches into the Capitol. During the first breach, Andrulonis jumped through a smashed-out window, found his way into a Senator's private office and later observed violence against police in the Crypt. Despite clear warning signs he was not permitted to be there, Andrulonis entered the Capitol a second time. Andrulonis followed a crowd down a hallway towards the Old Senate Chamber where, once again, he witnessed violence against police. Though he did not specifically partake in any of the violence, his continued presence presented a danger to the police, and ultimately made it more difficult for them to do their jobs and secure the Capitol building.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of two months' incarceration, 12 months' supervised release, and a $500 dollar fine in this matter.

### B.  Andrulonis' History and Characteristics

As set forth in the PSR, Ronald Andrulonis' criminal history consists of a conviction for Negligent Driving as a part of a plea deal where the original charge was Operating While Under the Influence. ECF 22 ¶ 40.

Andrulonis enlisted in the U.S. Army in November of 2004 and was honorably discharged in 2008. *Id*. at ¶74. Andrulonis was a private contractor in Iraq and Afghanistan in 2011 and 2015, respectively. While Andrulonis' military service is commendable, it renders his conduct on January 6 all the more troubling. His decision to storm a guarded government building is disturbing in light of his former military service and training, particularly as he witnessed violence against men and women in police uniform, many of whom are veterans themselves. In this case, Andrulonis' conduct and former military service demonstrates a very real need for specific deterrence in the form of incarceration.

Andrulonis was most recently employed as a construction worker for Amtrak. His employment was terminated upon arrest for the present offence. *Id*. at ¶¶69-72.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration followed by supervision upon release. First, as discussed above, Andrulonis entered the Capitol twice, pausing to take a selfie, while willfully ignoring the chaos and violence surrounding him.

Second, although Andrulonis accepted responsibility by pleading guilty, he has not taken any steps to denounce his actions on January 6, 2021, including to the Probation officer who conducted his PSR interview. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr.

10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Andrulonis did not accept the results of the 2020 presidential election, so on January 6 he invaded the Capitol not once, but twice. Andrulonis has not expressed sincere remorse for his actions, and with the 2024 presidential election approaching, he poses a risk of recidivism. The Court must sentence Andrulonis in a manner sufficient to deter him from engaging in future violence in pursuit of political goals.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Andrulonis based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Andrulonis has pleaded guilty to Count One of the Information, charging him with Unlawful Entry into the Capitol in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

"the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor or a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

Andrulonis entered the Capitol twice and accessed a private office space. Senator Merkley's office was clearly recognizable as a private office, and thus implicated similar concerns. Another rioter, Brandon Fellows, recognized it as some sort of "Oregon room." Affidavit, *Fellows, supra*, ECF No. 1 at ¶ 15. Fellows is awaiting sentencing. James Bonet received 3 months' incarceration for entering Merkley's office and smoking marijuana. *United States v. James Bonet*, 21-cr-121-EGS.[6]

---

[6] The government acknowledges that Felipe Marquez, who also entered Senator Merkley's office, received a sentence of three months' home detention; the government had recommended four months' incarceration. *United States v. Marquez,* 21-cr-136 (RC). One other defendant who entered Senator Merkley's office also received a probationary sentence, but he was a 68-year-old retiree with no criminal record who was there for less than a minute, and there was no evidence

In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pled guilty to misdemeanor charges of 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building all the way to the Speaker's Conference Room. Judge Boasberg sentenced the defendants each to 45 days of incarceration. A misdemeanant who reached the Senate Floor, even though she does not appear to have known where she was, also received a sentence of incarceration. *United States v. Courtright,* No. 21-cr-72 (CRC) (30 days incarceration, one-year supervised release).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

---

that he engaged in any flagrant conduct while there. *See United States v. Edwards,* 21-cr-366 (JEB)*.*

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Andrulonis must pay $500 in restitution, which reflects in part the role Andrulonis played in the riot on January 6.[8] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Andrulonis' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 93.

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Andrulonis to two months' incarceration and 12 months supervised release, special assessment of $25, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Andrulonis' liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime and assistance in providing information.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ REBEKAH LEDERER*
REBEKAH LEDERER
Pennsylvania Bar No. 320922
Assistant United States Attorney
U.S Attorney's Office for District of Columbia
601 D St. N.W, Washington, DC 20530
(202) 252-7012
rebekah.lederer@usdoj.gov